<u>NOT FOR PUBLICATION</u>

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| MALIK-IMARI ALI<br>A/K/A DARRYL BOZEMAN,<br><br>        Petitioner,<br><br>    v.<br><br>CHARLES WARREN, et al.,<br><br>        Respondents. | Civil Action No. 12-1830 (DRD)<br><br><br>**OPINION** |

**APPEARANCES**:

    JOSEPH E. KRAKORA, PUBLIC DEFENDER OF NEW JERSEY
    by:  James K. Smith, Assistant Deputy Public Defender
    P.O. Box 46003
    Newark, New Jersey 07101
        *Attorneys for Petitioner*

    JOHN L. MOLINELLI, BERGEN COUNTY PROSECUTOR
    by:  Catherine A. Foddai, Assistant Prosecutor
    Bergen County Justice Center
    Hackensack, New Jersey 07601
        *Attorneys for Respondents*

**Debevoise, Senior U.S. District Judge**

    Malik-Imari Ali, who was tried under the name Darryl Bozeman,[1] filed a Petition for a

Writ of Habeas Corpus under 28 U.S.C. § 2254 challenging a judgment of conviction filed in the

Superior Court of New Jersey, Bergen County, on June 16, 2006, imposing an aggregate term of

100.25 years in prison without parole for first-degree murder, felony murder and related offenses

---

[1] Throughout this Opinion, the Court will refer to Petitioner by his current name, Malik-Imari Ali.

arising from a home invasion.   Ali claims that he was denied his right to confront two witnesses - Terrence Terrell and Officer Santarpia - when the trial court limited his cross-examination of those witnesses and that the errors were not harmless.   The State filed an Answer arguing that Ali is not entitled to habeas relief on his Confrontation Clause claims because the New Jersey courts properly found that the Confrontation Clause errors were harmless.   Ali filed a Reply.

After carefully reviewing the arguments of the parties and the state court record, this Court agrees with the Appellate Division's conclusion that the limitation on the cross-examination of the state's primary witness - Terrence Terrell - violated the Confrontation Clause, see Delaware v. Van Arsdall, 475 U.S. 673 (1986); Davis v. Alaska, 415 U.S. 308 (1974); Olden v. Kentucky, 488 U.S. 227 (1988).   The Court holds, however, that the New Jersey courts unreasonably applied the harmless error standard of Chapman v. California, 386 U.S. 18 (1967), as well as the factors set forth in Van Arsdall.   See Davis v. Ayala, __ U.S. __, 135 S.Ct. 2187 (2015).   Because this Court's review of the state record, including undisputed facts which the Appellate Division ignored, leaves the Court in grave doubt as to whether the Confrontation Clause error regarding Terrell had a substantial and injurious effect in determining the jury's first-degree murder verdict, the error was not harmless.   Id.; see also O'Neal v. McAninch, 513 U.S. 432 (1995); Brecht v. Abrahamson, 507 U.S. 619(1993).   The Court further finds that the limitation on the cross-examination of Officer Santarpia violated the Confrontation Clause but this error was harmless.[2] The Court will grant a Writ of Habeas Corpus ordering the state to release Ali within 120 days if it does not retry him.

---

[2] Accordingly, this Opinion focuses primarily on the Confrontation Clause error as to Terrell.

# I.   BACKGROUND

## A.  The Crime

Under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), state court factual findings are presumed correct unless rebutted by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  As Ali has not attempted to rebut the factual findings of the Appellate Division, the Court will rely on those findings.  On June 24, 2002, Ali drove to the house of his childhood friend, Terrence Terrell, in Baltimore.  Terrell, who testified for the State in accordance with a plea agreement, testified that Ali and Ali's friend, Stanley Holmes, owed Terrell $25,000 because they had delivered "some bad drugs" to Terrell.  State v. Bozeman, 2010 WL 3720287 at *4 (N.J.Super.Ct., App. Div., Sept. 13, 2010).  During the return trip, Ali told Terrell about a man in Englewood, New Jersey (Nathan Johnson), who ran numbers and whose wife was a customer of Ali's estranged wife - Gina - at their hair salon.  On June 25, 2002, Ali, Terrell and Holmes gathered at the home of Ali and Gina in Teaneck, New Jersey.  According to Terrell, Ali brought a brown paper bag from the garage containing a MAC 10 small machine gun, a .380 handgun, handcuffs and duct tape, and the three men left the house with Holmes driving a burgundy Caravan minivan that was parked in the driveway.  Terrell testified that they went in the minivan to the home of Nathan and Mary Johnson in Englewood and that Holmes stayed in the minivan while Ali and Terrell waited in the backyard for about an hour and a half until Nathan arrived home.

Mary Johnson testified that Nathan returned home from his weekly card game at about 10:30 p.m.  Nathan came into the family room, which was next to the garage, and he told his wife that he had to go back out to the car.  She testified that, as he walked toward the garage door, the

3

door opened, knocking him down, and two men with guns entered the room.   Mary testified that she

> saw two men, both about six feet tall and weighing between 180-190 pounds.
> Both wore dark clothes, and one wore a baseball cap while the other had mesh
> covering his face.   The man wearing the baseball cap, whom Mary later identified
> as Terrell, put a gun to her head, handcuffed her behind her back, and told her to
> get down on the floor and to keep her head down.   The second man handcuffed
> Nathan.
>
> The men demanded to know where Mary and Nathan kept their safe.   Though
> they did have a "small little portable safe" behind the couch, they told the intruders
> that they did not have a safe.   Nonetheless, one of the men went over to look at
> the safe behind the couch, and then threw it on the floor.   One of them fired a shot,
> and said that "the next one is going to count," demanding again to know where the
> money was.
>
> One of the men said that he was going to shoot again, and Nathan replied, "if
> you're going to shoot[,] go ahead and shoot."   Someone then said, "shoot that m-
> f-" and two more shots were fired.   Nathan apparently died instantly.   Mary
> "never heard [her] husband's voice again."   She did not see which man shot her
> husband.

Bozeman, 2010 WL 3720287 at *3.

Mary further testified that the men then asked her where the money was and she directed

them to the bedroom down the hall.   Mary lifted up her head, saw that the room was empty, and

as she stood up, the handcuffs came loose.   Mary checked on her husband, who was unresponsive,

ran out of the house and began knocking on her neighbors' doors for help.

Terrell testified that Ali shot Nathan.   The Appellate Division described his testimony

regarding the incident as follows:

> Defendant and Terrell climbed over a fence into the backyard, and looked through
> a window, where they saw Mary lying on the couch. They decided to wait for
> Nathan to come home, and waited in the backyard for about an hour and a half.
> Once Nathan arrived home, defendant and Terrell entered the house. Defendant

4

pushed the garage door open and it "came off the hinges." He grabbed Nathan, while Terrell grabbed Mary and told her to get down on the ground.

Terrell further testified that he went into a bedroom looking for the safe, but he could not find any cash. He took some jewelry, including a Cartier watch, and grabbed two fur coats out of the closet. Terrell was getting ready to leave, when he saw Nathan, who had broken loose from his handcuffs, attempting to hit defendant with an object, and then Terrell heard two gunshots.

Defendant and Terrell ran out of the house, and Terrell dropped the fur coats. They flagged Holmes down, and jumped into the minivan, with Terrell getting in the front passenger door and defendant "jumped in" through the "sliding door" on the driver's side. Defendant told Holmes to "get me the f- out of Englewood," and gave him directions on where to go. Defendant said that he had left Nathan "leaking," meaning that defendant had shot him.

Bozeman, 2010 WL 3720287 at *4 (footnote omitted).   Terrell further testified that as Holmes drove, Ali changed into an orange shirt and blue shorts.

Tenafly Police Officer Columbia Santarpia testified that at about 11:20 p.m. she saw a red van on Tenafly Road.   She activated her overhead lights and pulled the van over because she had received a message that the Englewood Cliffs Police Department was looking for a red van that might have been involved in a burglary.   She testified that, when the van stopped, "the driver and passenger doors opened and two males fled the vehicle."   Bozeman, 2010 WL 3720287 at *5. Terrell testified that, after seeing the lights of the police car, Terrell put the .380 handgun under the passenger seat and he and Ali jumped out of the van and ran.   Santarpia saw a black male wearing all black clothing run in an easterly direction and a male dressed in blue shorts and an orange t-shirt.   She chased the male in the orange t-shirt while other officers chased the other man. She saw the man in the orange t-shirt "'crouched behind a bush' before he jumped up and ran around the corner to a senior citizens' complex."   Id.   She then got back into her car and drove to the complex, but she was unable to locate the man.

5

In the meantime, Tenafly Police Officer Michael DeMoncada chased and caught Terrell. A pat down search for weapons reveled cash, a Cartier watch, jewelry and one glove.  Holmes was not seen or arrested at the time Santarpia stopped the van.   When a detective from the Bergen County Prosecutor's Office, who had responded to the scene, looked into the open door of the van, he saw a MAC 10 gun, duct tape, keys to a car (later determined to be the keys for the Johnsons' Lexus), clothing, a jewelry box, and a jewelry box drawer.   After the van had been moved to a garage, the detective searched it and found keys for a Lincoln Navigator (later determined to be the keys to Ali's Lincoln Navigator), a wallet containing Ali's driver's license, blue sweatpants, and a black hooded sweatshirt with mesh to cover the face.

A forensic scientist testified that DNA from the sweatshirt matched Ali's and Nathan's DNA.   Forensic testing also revealed that the discharged bullets and casings found in the Johnsons' home had been fired from the MAC 10 gun found in the van, which was leased to Gina. The next day, Ali's girlfriend, Tanya Hall, bought a bus ticket for him and on August 8, 2002, after learning that Ali had taken a bus to Atlanta, Georgia, two FBI agents arrested him in his hotel room in Atlanta.

**B.      The State Court Proceedings**

Ali was indicted for capital murder.   Ali, Terrell, Holmes and Gina were indicted for first-degree murder, felony murder, weapons charges and other crimes.   On February 5, 2004, Terrell entered into a cooperation agreement wherein he pled guilty to felony murder with robbery as the underlying felony and kidnapping.   He also agreed to testify against Ali, Holmes and Gina in exchange for a recommended sentence of 30 years.

Ali and Gina were tried together, and Holmes was tried separately.   On February 22, 2006, prior to trial, on the motion of Ali and Gina, the trial court ordered the state to obtain from the United States Attorney in the Eastern District of New York information regarding (1) the existence of a nexus between this case and the federal prosecution of members of a drug organization entitled United States v. McGriff and (2) what promises, if any, federal authorities made to Terrell in exchange for cooperation regarding Terrell's pending sentence in New Jersey.   By letter dated February 24, 2006, an Assistant Bergen County Prosecutor informed the trial court that on February 23, 2006, Assistant United States Attorney Carolyn Pokorny told him that "there was no known relationship between the acts alleged in United States v. McGriff, et al., and the home invasion, armed robbery and murder charges encompassed" in the state prosecution, and that there was "no signed or unsigned cooperation agreement between Terrence Terrell and the federal government."   (ECF No. 7-3 at 56.)   The letter further stated that "[i]t was reported to me that Terrence Terrell is not, and was not, a target in the aforementioned federal case nor was he facing or 'working off' charges in exchange for his cooperation" or "a target of an investigation of a double homicide that took place in Baltimore."   Id.   The letter further stated that "no promises of any kind were given to Terrence Terrell in exchange for potential testimony of Terrell as a witness," but "steps would be taken to ensure his protection while in custody . . . which does not preclude Terrell from serving his time in a federal prison based on security and/or protection concerns."   Id. at 57.

At a hearing on March 22, 2006, the state dismissed the death penalty charge against Ali in count one.   In addition, the trial court was "satisfied that there [was] no agreement with respect to Mr. Terrence Anthony Terrell [and federal authorities] and I'm not going to allow any further

discussion on that issue either now or reopen it later." (ECF No. 7-22 at 15.) Counsel for Gina stated that he intended to cross-examine Terrell about serving his sentence in federal custody, as Terrell's "expectation of what's going to happen to him [is] important for this jury." Id. at 17. Ali's counsel joined in the application, arguing that such a limitation on the cross-examination of Terrell regarding bias and expectation would deny Ali a fair trial, but the trial court ruled that "[t]here will be no cross-examination on any issue involving where he's going to serve the sentence." Id. at 16. The trial court concluded the discussion in this way: "Your positions are noted now, amply so, Mr. McMahon and Mr. Robbins. I'm not allowing it. That's my ruling." Id. at 19.

Ali's and Gina's trial began on March 30, 2006. Terrell testified on April 12, 2006, and April 13, 2006. Summations occurred on April 25, 2006, and the trial court instructed the jury on April 26, 2006. Significantly, in instructing the jury on felony murder, the trial court stated that there was evidence suggesting that Terrell shot Nathan:

> The State contends that on or about June 25th, 2002 . . , while defendant Darryl Bozeman [Ali] was engaged in the commission of, or attempt to commit, or flight after committing the crimes of robbery and/or burglary under a kidnapping, that he shot and killed Nathan Johnson. There's also evidence in the case that tends to suggest that Terrence Terrell shot Nathan Johnson. If you find that Terrence Terrell shot Nathan Johnson, the State alleges that the shooting took place while Darryl Bozeman [Ali] or an accomplice or co-conspirator for whom he is legally accountable was engaged in the commission of, or flight after committing the crimes of robbery and burglary, and, therefore, constitutes felony murder.

(ECF No. 7-43 at 43.)

During deliberations on the afternoon of April 27, 2006, the jury sent a note to the trial judge asking the judge to re-read the first-degree murder instruction and the trial judge complied. (ECF Nos. 7-3 at 73, 7-45 at 16-20.) On May 1, 2006, a jury found Ali guilty of first-degree

8

murder, robbery, burglary, kidnapping, conspiracy, felony murder, possession of a firearm for an unlawful purpose and unlawful possession of a weapon.

Unbeknownst to defense counsel, ten days after Terrell testified, Carolyn Pokorny, Assistant United States Attorney for the Eastern District of New York, brought Terrell a document entitled "Agreement Not to Prosecute," which he signed.   (ECF No. 7-3 at 63-65.)   In the agreement, Terrell agrees to cooperate with the United States Attorney for the Eastern District of New York and to give truthful and complete information and testimony in exchange for promises that (1) "no criminal charges will be brought against the Witness for his heretofore disclosed conduct relating to racketeering, gun possession and conspiracy to distribute and possession with intent to distribute heroin and cocaine in or about and between 2000 and 2002, and (2) if Terrell requests, and in the United States Attorney's "judgment the request is reasonable, the Office will make application and recommend that [Terrell] and, if appropriate, other individuals be placed in the Witness Security Program, it being understood that the [United States Attorney] has authority only to recommend and that the final decision to place an applicant in the Witness Security Program rests with the Department of Justice[.]"   (ECF No. 7-3 at 64-65.)

By letter to the trial court dated June 12, 2006, counsel for Gina requested an adjournment of the June 16, 2006, sentencing date pending a motion to discover why the cooperation agreement was not revealed to defense counsel.  (ECF No. 7-3 at 61.)  Counsel stated that he had just discovered that Terrell was granted relief from federal prosecution and potential placement in the Federal Witness Security program ten days after he testified, contrary to the representations of the prosecution which resulted in the limitation on the cross-examination of Terrell regarding his federal cooperation.   The agreement not to prosecute was attached to the letter.

9

On June 16, 2006, the trial judge denied this request to adjourn and for discovery, and sentenced Ali to life imprisonment (85% of 75 years or 63.75 years) on the first degree murder charge and a consecutive 45-year term on the remaining charges for a total aggregate term of 100.25 years without parole.   (ECF No. 7-3 at 22; 7-47 at 13.)

Ali appealed, arguing, inter alia, that his Sixth Amendment right of confrontation was violated (1) when he was not permitted to cross-examine Terrell about the agreement he was negotiating with federal prosecutors in the Eastern District of New York and (2) when he was not permitted to cross-examine Santarpia about her seeing him in handcuffs immediately before she identified him at trial.   The State conceded before the Appellate Division that the court erred by limiting the cross-examination of Terrell but argued that the error was harmless.   On September 13, 2010, the Appellate Division expressed "legitimate concern about the fairness of the trial in the aggregate," Bozeman, 2010 WL 3720287 at *12, invited the trial court to do a "careful analysis of whether the defendant should be entitled to a new trial based on the aggregate of concerns which we have addressed," id. at *16, and remanded for the trial court to answer the following questions:

> • were Bozeman's confrontation clause rights violated by the trial court's limiting the cross-examination of Terrell, and the jury being unaware of the full extent of Terrell's cooperation with foreign law enforcement authorities, as well as his expectations regarding punishment and concerns about personal safety;
>
> • was Santarpia's in-court identification of Bozeman reliable;
>
> • were Bozeman's confrontation clause rights violated by the trial court's limiting the cross-examination of Santarpia, and the jury being unaware that Santarpia had just seen Bozeman handcuffed and in shackles in the courthouse hallway; and
>
> • were the jury instructions fatally flawed due to the absence of a specific instruction relating to evidence of Bozeman's involvement in drug trafficking with Holmes and Terrell?

State v. Bozeman, 2011 WL 2496218 at *2-*3 (N.J. Super. Ct., App. Div., June 24, 2011) (footnote omitted).

On October 27, 2010, the trial court conducted a three-hour evidentiary hearing at which Terrell and Assistant United States Attorney Carolyn Pokorny testified.   Pokorny testified that she called Terrell as a witness in two trials, that he testified on January 10, 2007, against Victor Wright, see United States v. Wright, 2014 WL 4924436 (E.D.N.Y. Oct. 2, 2014), and that he later testified in the capital case against Kenneth McGriff, see United States v. McGriff, 2014 WL 4965955 (E.D.N.Y. Oct. 3, 2014).   Pokorny averred that Terrell had testified before a grand jury in the Eastern District of New York on August 5, 2002, about five weeks after New Jersey arrested him.   She indicated that, in the course of preparing Terrell for trial, law enforcement met with him in the Bergen County Jail on at least nine occasions between August 5, 2002, and August 4, 2003.[3] Pokorny met with him at the jail to prepare him for trial on approximately six occasions.

Terrell testified on direct that in 2001 he was a suspect in a double homicide in Baltimore and that, when he was arrested on June 25, 2002, he sent word that he wanted to speak to the Baltimore homicide detective, who soon came to see him in New Jersey, together with a New York police officer.   He testified that, during his incarceration at the Bergen County Jail in New Jersey, he met with New York police and he made phone calls to targets in the drug organization which were recorded.   He testified on cross-examination that he knew that the federal authorities could

---

[3] Terrell was arrested on June 25, 2002.   He testified before a federal grand jury in the Eastern District of New York on August 5, 2002.   He entered into a cooperation agreement with the State on February 5, 2004.   He testified against Ali on April 12 and 13, 2006, and he entered into the non-prosecution agreement with the United States Attorney for the Eastern District of New York on April 23, 2006.

help him the most, as he faced a life sentence if he were prosecuted on federal gun and drug charges and he wanted to serve his New Jersey sentence in federal custody.   He further testified on cross-examination that he did not have an attorney in dealing with federal, New York and Baltimore law enforcement officials as he didn't feel he needed one.   He testified on cross that, although he didn't have a written non-prosecution agreement until April 23, 2006, officials acknowledged from the get-go that (1) they would not prosecute him if he cooperated and told the truth and (2) he did not want to serve his time in a New Jersey state prison.   Terrell testified that the drug organization he was a member of bought kilos of heroin and cocaine in New York City, sold it at a higher price in Baltimore, and used various people including Ali to transport drugs from New York to Baltimore.   Terrell acknowledged that this was why Ali owed the organization $25,000.

After hearing argument of counsel, the trial judge issued an oral opinion in which he determined that the limitations on the cross-examination of Terrell and Santarpia were harmless beyond a reasonable doubt.   Ali appealed, arguing that the limitations on the cross-examination of Terrell and Santarpia violated the Confrontation Clause.   The State "conceded that the trial court should have (1) allowed Bozeman to question Terrell about the impact of Terrell's cooperation with federal authorities [and] (2) allowed cross-examination off Santarpia regarding her encounter with Bozeman in the courthouse hallway [immediately prior to her in-court identification]."   State v. Bozeman, 2011 WL 2496218 at *3 n.7.   The Appellate Division found that the limitation on cross-examination of Terrell regarding his cooperation with Maryland, New York and federal law enforcement authorities, his expectation of federal immunity for his actions, his concern for his and his wife's safety, and his desire to serve his New Jersey sentence in the federal witness protection program violated the Confrontation Clause, but the Confrontation

Clause error was harmless because Ali was otherwise "given an adequate opportunity to effectively impeach the credibility of Terrell" and, even in the absence of Terrell's testimony, the case demonstrating Ali's participation in the charged crimes was "formidable." Id. at *7. The Appellate Division similarly found that the limit on the cross-examination of Santarpia was also harmless. The Appellate Division affirmed the conviction and the New Jersey Supreme Court denied certification. See State v. Bozeman, 208 N.J. 600 (2011) (table).

## C.  Procedural History of § 2254 Petition

Ali filed his § 2254 Petition, through counsel, on March 26, 2012. The Petition raises two grounds:

> Ground One:  THE STATE COURTS, HAVING ACCEPTED THAT THERE WAS A VIOLATION OF PETITIONER'S SIXTH AMENDMENT RIGHT TO CONFRONTATION IN THE TRIAL COURT'S RULINGS PRECLUDING DEFENSE COUSNEL FROM CROSS-EXAMINING TERRENCE TERRELL, A KEY STATE'S WITNESS, ABOUT AN AGREEMENT THAT HE WOULD BE ALLOWED TO SERVE HIS NEW JERSEY SENTENCE IN FEDERAL CUSTODY AND HIS COOPERATION IN A MAJOR FEDERAL PROSECUTION WHICH LED TO HIS RECEIVING WHAT HE UNDERSTOOD TO BE IMMUNITY, UNREASONABLY FOUND THOSE ERRORS TO BE HARMLESS.  BECAUSE PETITIONER SUFFERED ACTUAL PREJUDICE AS A RESULT OF THOSE CONSTITUTIONAL VIOLATIONS, HE IS ENTITLED TO RELIEF ON HABEAS.

> Ground Two: WHERE PETITIONER WAS PRECLUDED FROM CROSS-EXAMINING OFFICER COLUMBIA SANTARPIA ABOUT THE FACT THAT ONLY MINUTES BEFORE IDENTIFYING PETITIONER IN COURT, SHE HAD SEEN HIM IN A COURTHOUSE HALLWAY IN CHAINS AND SHACKLES SURROUNDED BY FOUR SHERIFF'S OFFICERS, THE STATE COURTS UNREASONABLY FOUND THIS ACKNOWLEDGED VIOLATION OF THE RIGHT TO CONFRONTATION TO BE HARMLESS. BECAUSE PETITIONER SUFFERED ACTUAL PREJUDICE, HE IS ENTITLED TO RELIEF ON HABEAS.

(ECF No. 1 at 8, 14.)

The State filed an Answer arguing that Ali cannot show that the Appellate Division's adjudication of the Confrontation Clause claims was contrary to or an unreasonable application of Supreme Court precedent.   (ECF No. 7 at 29, 46.)   Ali filed a Reply and a memorandum arguing that he is entitled to a writ because the limitations on the cross-examination of Terrell and Santarpia violated the Confrontation Clause and the errors had a substantial and injurious effect or influence in determining the jury's verdict.   (ECF No. 9 at 24.)

## II.   STANDARD OF REVIEW FOR RELIEF UNDER § 2254

Section 2254 of title 28 of the United States Code sets limits on the power of a federal court to grant a habeas petition to a state prisoner.   See Cullen v. Pinholster, 131 S.Ct. 1388, 1398 (2011).   Section 2254(a) permits a court to entertain only claims alleging that a person is in state custody "in violation of the Constitution or laws or treaties of the United States."   28 U.S.C. § 2254(a).   Where a state court adjudicated petitioner's federal claim on the merits,[4] as in this case, a court "has no authority to issue the writ of habeas corpus unless the [state c]ourt's decision 'was contrary to, or involved an unreasonable application of, clearly established Federal Law, as determined by the Supreme Court of the United States', or 'was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'"   Parker v. Matthews, 132 S.Ct. 2148, 2151 (2012) (quoting 28 U.S.C. § 2254(d)).   "When reviewing state criminal convictions on collateral review, federal judges are required to afford state

---

[4] "For the purposes of Section 2254(d), a claim has been 'adjudicated on the merits in State court proceedings' when a state court has made a decision that 1) finally resolves the claim, and 2) resolves th[at] claim on the basis of its substance, rather than on a procedural, or other, ground." Shotts v. Wetzel, 724 F.3d 364, 375 (3d Cir. 2013) (citation and internal quotation marks omitted).

14

courts due respect by overturning their decisions only when there could be no reasonable dispute that they were wrong." Woods v. Donald, 135 S.Ct. 1372, 1376 (2015). The petitioner carries the burden of proof, and review under § 2254(d) is limited to the record that was before the state court that adjudicated the claim on the merits. See Pinholster, 131 S.Ct. at 1398.

A court begins the analysis under § 2254(d)(1) by determining the relevant law clearly established by the Supreme Court. See Yarborough v. Alvarado, 541 U.S. 652, 660 (2004). "[C]learly established law for purposes of § 2254(d)(1) includes only the holdings, as opposed to the dicta, of t[he Supreme Court's] decisions," as of the time of the relevant state-court decision. Woods, 135 S.Ct. at 1376 (quoting White v. Woodall, 134 S.Ct. 1697, 1702 (2014), and Williams v. Taylor, 529 U.S. 362, 412 (2000)). A decision is "contrary to" a Supreme Court holding within 28 U.S.C. § 2254(d)(1) if the state court "contradicts the governing law set forth in [the Supreme Court's] cases" or if it "confronts a set of facts that are materially indistinguishable from a decision of th[e Supreme] Court and nevertheless arrives at a [different] result." Williams, 529 U.S. at 405-06. Under the "'unreasonable application' clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from th[e Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Id., 529 U.S. at 413.

Where a petitioner seeks habeas relief, pursuant to § 2254(d)(2), on the basis of an erroneous factual determination of the state court, two provisions of the AEDPA necessarily apply. First, the AEDPA provides that "a determination of a factual issue made by a State court shall be presumed to be correct [and] [t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence." 29 U.S.C. § 2254(e)(1); see Miller-El v. Dretke,

15

545 U.S. 231, 240 (2005).   Second, the AEDPA precludes habeas relief unless the adjudication of the claim "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."   28 U.S.C. § 2254(d)(2).

### III.   DISCUSSION

**A.     Confrontation Clause**

The Appellate Division found that the trial court violated Ali's right to confront witnesses when the trial court denied him the opportunity to cross-examine Terrell about his cooperation with federal, Maryland, and New York law enforcement authorities regarding a drug organization of which Terrell was a member.   The Appellate Division also found that the limitation on the cross-examination of Santarpia concerning her seeing Ali in shackles immediately before she identified him at trial violated his rights under the Confrontation Clause.   The Appellate Division affirmed the conviction because it found that these errors were harmless beyond a reasonable doubt under Chapman.

The Confrontation Clause provides that, "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him."   U.S. Const. amend VI.   This guarantee applies to both federal and state prosecutions.   See Pointer v. Texas, 380 U.S. 400 (1965).   The Court will review Supreme Court precedent concerning restrictions on cross-examination and determine whether Ali's Confrontation Clause rights were violated.

In 1968, the Court held in Smith v. Illinois, 390 U.S. 129 (1968), that the state judge had violated Smith's right to confront the only witness to the charged drug transaction when the court did not allow defense counsel to ask the witness what his real name was and where he lived.   The Court explained its ruling as follows:

16

> The extent of cross-examination with respect to an appropriate subject of inquiry is within the sound discretion of the trial court . . . .   But no obligation is imposed on the court . . . to protect a witness from being discredited on cross-examination, short of an attempted invasion of his constitutional protection from self incrimination, properly invoked.   There is a duty to protect him from questions which go beyond the bounds of proper cross-examination merely to harass, annoy or humiliate him . . . .   But no such case is presented here.

Smith, 390 U.S. at 132-33 (quoting Alford v. United States, 282 U.S. 687, 692-94 (1931)).

Next, in Davis v. Alaska, 415 U.S. 308 (1974), Davis was found guilty of burglary of a bar and grand larceny based primarily on the testimony of Richard Green.   At the time of the trial and the crime, Green was on probation after having been adjudicated delinquent for burglarizing two cabins.   Green testified that while going on an errand for his mother he confronted two men standing beside a blue Chevrolet on the road near his house, and that on his return he saw one of the men at the back of the car "with something like a crowbar."   Id. at 310.   The safe stolen from the bar was discovered later that afternoon "at the point, according to Green, where the Chevrolet had been parked."   Id.   Green identified Davis as the man with the crowbar.   Defense counsel sought to cross examine Green about being on probation to support the arguments that Green identified Davis to shift suspicion away from himself and that he might have acted out of fear or concern of jeopardizing his probation.   The trial court prohibited cross-examination of Green concerning his juvenile record, which was confidential under state law.   The Alaska Supreme Court affirmed the conviction primarily for the reason that "counsel for the defendant was able adequately to question the youth in considerable detail concerning the possibility of bias or motive.'"   Id. at 314-315 (citation omitted).   The Supreme Court reversed, holding that "the Confrontation Clause requires that a defendant in a criminal case be allowed to impeach the credibility of a prosecution witness by cross-examination directed at possible bias deriving from

17

the witness' probationary status as juvenile delinquent when such an impeachment would conflict with a State's asserted interest in preserving the confidentiality of juvenile adjudications of delinquency." Id. at 309.   The Court explained its rationale:

> The State's policy interest in protecting the confidentiality of a juvenile offender's record cannot require yielding of so vital a constitutional right as the effective cross-examination for bias of an adverse witness. The State could have protected Green from exposure of his juvenile adjudication in these circumstances by refraining from using him to make out its case; the State cannot, consistent with the right of confrontation, require the petitioner to bear the full burden of vindicating the State's interest in the secrecy of juvenile criminal records.

Davis, 415 U.S. at 320.

In Delaware v. Van Arsdall, Van Arsdall was convicted of murder.   The Delaware Supreme Court reversed his conviction, finding that restriction on the defense's cross examination designed to show bias on the part of a prosecution witness violated the Confrontation Clause and that the Confrontation Clause violation required automatic reversal.   The Supreme Court held that the restriction on cross-examination violated the Confrontation Clause but reversed because the Delaware Supreme Court erroneously failed to consider whether the error was harmless.   The facts showed that Van Arsdall was one of about a dozen guests who attended a party in the adjacent apartments of Pregent and Fleetwood which lasted from the morning of December 31 until shortly before midnight. The state's case was based on circumstantial evidence and proceeded on the theory that Van Arsdall had either killed a visitor named Doris Epps or assisted Pregent in doing so.   Fleetwood was the 10th of 16 prosecution witnesses.   He testified on direct that sometime between 11 and 11:30 p.m. "he walked across the hall, looked into Pregent's living room from the doorway, and saw [Van Arsdall] sitting on the edge of the sofa bed next to Pregent's feet. Fleetwood, who did not have a complete view of the bed, did not see Epps or anyone else in the

18

apartment." Id. at 676.   Fleetwood returned to his own apartment and passed out about midnight. The trial court did not allow defense counsel to "impeach Fleetwood by questioning him about the dismissal of a criminal charge against him - being drunk on a highway - after he had agreed to speak with the prosecutor about Epps' murder." Id. at 676.   Van Arsdall testified that he and Pregent were the only two people in the apartment with Epps when Pregent stabbed her to death. Both were arrested at the scene of the crime and charged with Epps' murder but they were tried separately.

The Supreme Court noted that, while "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant," the trial court had violated the Confrontation Clause in prohibiting cross-examination regarding the bias of Fleetwood as a result of the dismissal of his drunkenness charge because "[a] reasonable jury might have received a significantly different impression of Fleetwood's credibility had [Van Arsdall's] counsel been permitted to pursue his proposed line of cross-examination." Id. at 680.   The Court explained its rationale:

> In this case, however, the trial court prohibited all inquiry into the possibility that Fleetwood would be biased as a result of the State's dismissal of his pending public drunkenness charge. By thus cutting off all questioning about an event that the State conceded had taken place and that a jury might reasonably have found furnished the witness a motive for favoring the prosecution in his testimony, the court's ruling violated respondent's rights secured by the Confrontation Clause.

Van Arsdall, 475 U.S. at 679.

The Court further held that the constitutionally improper denial of a defendant's opportunity to impeach a witness for bias was subject to harmless error analysis under <u>Chapman v. California</u>, 386 U.S. 18 (1967), and remanded for consideration of harmless error.   The Court explained application of the harmless error standard where cross-examination regarding bias or motive was curtailed as follows:

> Whether such an error is harmless in a particular case depends upon a host of factors, all readily accessible to reviewing courts. These factors include the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.

<u>Id.</u> at 684.

In <u>Olden v. Kentucky</u>, 488 U.S. 227 (1988) (per curiam), Olden, a black man, was convicted of forcible sodomy of Starla Matthews, a young white woman.   She testified that she and a friend had driven to Princeton, Kentucky, to exchange Christmas gifts with Bill Russell, Olden's half brother, and had stopped at a boot-legging bar serving a predominantly black clientele.   Matthews testified that she became intoxicated and she left the bar with Olden and his friend and that Olden raped and sodomized her, assisted by Harris who held her arms.   They drove her to a dump where two other men also raped her and, at her request, the men dropped her off near Bill Russell's house.   Russell testified that on the evening in question he went outside after hearing a noise, saw Matthews getting out of Harris's car, and she immediately told him that she had just been raped by Olden and Harris.   Olden and Harris testified that Matthews had consented. Although at the time of the incident Matthews and Russell were both married to and living with other people, they were involved in an extramarital relationship, and were living together at the

20

time of the trial.   The trial court prohibited defense to cross-examine Matthews about her cohabitation with Russell, even though Olden's theory of the case was that Matthews made up the rape story to protect her relationship with Russell, who would have otherwise been suspicious when he saw her getting out of Harris' car.   The Kentucky Court of Appeals affirmed the conviction, finding that because Matthews was white and Russell was black, the admission of evidence that they were living together at the time of the trial may have created extreme prejudice against Matthews.

The Supreme Court held that, although defense counsel cross-examined Matthews regarding a number of inconsistencies in her various accounts of the alleged crime, the limitation on the cross-examination concerning her living with Russell "was beyond reason." Olden, 488 U.S. at 232.   "[A] criminal defendant states a violation of the Confrontation Clause by showing that he was prohibited from engaging in otherwise appropriate cross-examination designed to show a prototypical form of bias on the part of the witness, and thereby 'to expose to the jury the facts from which jurors . . . could appropriately draw inferences relating to the reliability of the witness.'" Id. at 231 (quoting Van Arsdall, 475 U.S. at 680 and Davis, 415 U.S. at 318).   The Court also determined that the error was not harmless:

> Here, Matthews' testimony was central, indeed crucial, to the prosecution's case. Her story, which was directly contradicted by that of petitioner and Harris, was corroborated only by the largely derivative testimony of Russell, whose impartiality would also have been somewhat impugned by revelation of his relationship with Matthews. Finally, as demonstrated graphically by the jury's verdicts, which cannot be squared with the State's theory of the alleged crime, and by Judge Clayton's dissenting opinion below, the State's case against petitioner was far from overwhelming. In sum, considering the relevant Van Arsdall factors within the context of this case, we find it impossible to conclude "beyond a reasonable doubt" that the restriction on petitioner's right to confrontation was harmless.

21

Olden, 488 U.S. at 233.

Applying these precedents to Ali's case, the Court agrees with the Appellate Division that the limits on cross-examination of Terrell and Santarpia violated the Confrontation Clause. Significantly, the unconstitutional limit placed on Terrell's cross-examination prevented counsel from exposing an additional motive for Terrell's testifying in favor of the prosecution - the desire to satisfy federal authorities - and this limit violated Ali's right to confront witnesses against him. Terrell testified on remand that he contacted a Baltimore detective shortly after his arrest in New Jersey in order to make a deal concerning the Billy Guy and Kenneth McGriff drug organization of which he was a member.   Terrell testified that he faced a life sentence if he were prosecuted on federal charges based on his role in the organization and that he knew he had the most to gain by cooperating with federal authorities.   His adequacy as a federal witness was in effect being tested when he testified against Ali.   Terrell did not formalize his federal no-prosecution agreement until after he testified against Ali and he had a lot to lose if federal authorities did not deem his testimony satisfactory.   The Supreme Court found in Van Arsdall that the trial court's foreclosure of inquiry into a relatively modest benefit - dismissal of a pending drunk-driving charge - was sufficient to support the conclusion that the court had withheld information necessary for the jury to make a discriminating appraisal of the witness's possible biases and motivation.   Tyrrell hoped to receive a benefit from federal prosecutors far greater than dismissal of a drunk driving charge.   In this case, the trial court prohibited *all* inquiry into the possibility that Tyrrell would be biased as a result of his pending negotiation of a non-prosecution deal with federal authorities in violation of his constitutional right to confront witnesses.

22

In addition, the restraints imposed on the scope of Terrell's cross-examination did not fall within the reasonable limits which a court has the discretion to impose under Van Arsdall and Davis v. Alaska, as the prohibition was not imposed to avoid harassment, prejudice, confusion of the issues, to protect a witness's safety, or because cross-examination was repetitive or marginally relevant to motive or bias.  "By thus cutting off all questioning about an event that the State conceded [was taking] place and that a jury might reasonably have found furnished [Terrell] a motive for favoring the prosecution in his testimony, the court's ruling violated [Ali's] rights secured by the Confrontation Clause."  Van Arsdall, 475 U.S. at 679 (footnote omitted); see also Olden, 488 U.S. 227; Davis v. Alaska, 415 U.S. 308; Smith, 390 U.S. 129; United States v. Chandler, 326 F.3d 210 (3d Cir. 2003).

## B.      Harmless Error

The State argues that (1) the standard under the AEDPA is whether the Appellate Division adjudication of harmless error was contrary to, or an unreasonable application of Supreme Court holdings and (2) the Appellate Division's adjudication of harmlessness was not contrary to, or an unreasonable application of Chapman, Van Arsdall, Davis v. Alaska, or Olden.  (ECF No. 7 at 27.)  Relying on Fry v. Pliler, 551 U.S. 112, 122 (2007), Brecht, 507 U.S. at 637, and O'Neal v. McAninch, Ali argues that the proper standard is whether the Confrontation Clause error had substantial and injurious effect or influence in determining the jury's verdict.  (ECF No. 9 at 24.)  As will be explained below, the Court concludes that the AEDPA standard governs in combination with Brecht, and that the Appellate Division's adjudication of harmless error with respect to Terrell was an unreasonable application of Chapman and Van Arsdall.  Because the Court has grave doubt about whether the unconstitutional limit on Terrell's cross-examination had a substantial

and injurious effect on the jury's determination that Ali was guilty beyond a reasonable doubt of killing Nathan Johnson, the Confrontation Clause violation was not harmless.   The Court further finds that the Confrontation Clause error as to Santarpia was harmless.   The limit on Santarpia's cross-examination related solely to whether Ali was a participant in the incident.   This Court agrees with the Appellate Division that because other evidence supported a finding that Ali was a participant, had the jury learned that Santarpia saw Ali in shackles immediately prior to identifying him at trial, there is not a reasonable possibility that the jury's verdict would have been different.

    The test for whether a federal constitutional violation was harmless depends on the procedural posture of the case.   See Ayala, 135 S.Ct. at 2197.   On direct review, "before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." Chapman, 386 U.S. at 24.   Prior to the AEDPA, the Supreme Court held in Brecht, 507 U.S. at 637, that the harmless error test to be applied on habeas review was a standard more difficult for the habeas petitioner to meet.   See also Ayala, 135 S.Ct. at 2197-98.   In a collateral proceeding, petitioners "are not entitled to habeas relief based on trial error unless they can establish that it resulted in 'actual prejudice.'"   Ayala, 135 S.Ct. at 2197 (quoting Brecht, 507 U.S. at 637 and United States v. Lane, 474 U.S. 438, 449 (1986)).   Under the Brecht standard, "[t]here must be more than a 'reasonable possibility that the error was harmful."   Ayala, 135 S.Ct. at 2198 (quoting Brecht at 637).   Habeas "relief is proper only if the federal court has 'grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict.'"   Ayala, 135 S.Ct. at 2197-98 (quoting O'Neal, 513 U.S. at 436.   The O'Neal Court set forth

24

> the legal rule that governs the special circumstance in which record review leaves the conscientious judge in grave doubt about the likely effect of an error on the jury's verdict.   (By "grave doubt" we mean that, in the judge's mind, the matter is so evenly balanced that he feels himself in virtual equipoise as to the harmlessness of the error.)   We conclude that the uncertain judge should treat the error, not as if it were harmless, but as if it affected the verdict (i.e., as if it had a "substantial and injurious effect or influence in determining the jury's verdict").

O'Neal, 513 U.S. at 435; accord Fry, 551 U.S. at 121 n.3 ("We have previously held that when a court is 'in virtual equipoise as to the harmlessness of the error' under the Brecht standard, the court should 'treat the error . . . as if it affected the verdict.") (quoting O'Neal, 513 U.S. at 435).

Recently, in Davis v. Ayala the Supreme Court clarified the harmless error test to be applied under the AEDPA when, as in Ali's case, the state court found that the federal constitutional error was harmless beyond a reasonable doubt under Chapman.   First, the Ayala Court ruled that a state court's harmlessness holding "undoubtedly constitutes an adjudication of [the] constitutional claim 'on the merits.'"   Ayala, 135 S.Ct. at 2198.   Accordingly, under § 2254(d) a court "may not overturn the [state court's] decision unless that court applied Chapman in an objectively unreasonable manner," id. (citation and internal quotation marks omitted), and a state court harmlessness determination "is not unreasonable if 'fairminded jurists could disagree on [its] correctness."   Id. at 2199 (quoting Harrington v. Richter, 562 U.S. 86, 110 (2011)).   Second, Ayala held that "a prisoner who seeks federal habeas corpus relief must satisfy Brecht, and if the state court adjudicated his claim on the merits, the Brecht test subsumes the limitations imposed by AEDPA."   Ayala, 135 S.Ct. at 2199 (citing Fry, 551 U.S. at 119-20).   Third, the Supreme Court rejected the notion that a state court's harmlessness determination has no significance under Brecht.   See Ayala, 135 S.Ct. at 2198.   "The role of a federal habeas court is . . . not to apply de novo review of factual findings and to substitute its own opinions for the

determination made on the scene by the trial judge."   Id. at 2202.   Instead, before a court may grant habeas relief "the evidence in the record must raise 'grave doubt[s]'" that the jury verdict would have been different, which "requires much more than a 'reasonable possibility' that the result" would have been different.   Id. at 2203.

In this case, the Appellate Division's holding that the unconstitutional limit on the cross-examination of Terrell was harmless beyond a reasonable doubt under Chapman constitutes an adjudication on the merits.   Accordingly, this Court must review the record to determine (1) whether there is much more than a reasonable possibility that the unconstitutional limit on the cross-examination of Terrell had a substantial and injurious effect in determining the jury's first-degree murder verdict, and (2) whether the Appellate Division unreasonably applied the harmless error standard under Chapman and the factors set forth in Van Arsdall.   As will be fully explained below, the Appellate Division unreasonably applied the Van Arsdall factors by ignoring critical undisputed facts in the record; a careful review of the Van Arsdall factors and the record leaves the Court in grave doubt that the unconstitutional limitation of the cross-examination Terrell had an injurious effect on the jury's first-degree murder verdict.

The Appellate Division recognized that when a court conducts a harmless error analysis of Confrontation Clause violations involving restrictions on cross-examination, it must apply the Van Arsdall factors:   (1) "the importance of the witness' testimony in the prosecution's case;" (2) "whether the testimony was cumulative;" (3) "the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points;" (4) "the extent of cross-examination otherwise permitted;" and, (5) "the overall strength of the prosecution's case."   Van

26

Arsdall, 475 U.S. at 684.   The Court will now review the Appellate Division's application of these factors to the undisputed facts in the record.

(1) The Importance of Terrell's Testimony in the Prosecution's Case

The State argues that Terrell's testimony was not crucial and relies on the evidence cited by the Appellate Division that linked Ali to the incident, i.e., family connection to the getaway minivan, the presence of Ali's and Nathan's DNA on the sweatshirt found in the minivan, Ali's being seen in New York City shortly after the crimes wearing the blue shorts, Ali's flight after telling his girlfriend that there was some trouble, and a card from Gina's salon found in the minivan.   (ECF No. 7 at 28.)   On the other hand, Ali correctly argues that Terrell's testimony was crucial to the jury's finding beyond a reasonable doubt that Ali was guilty of first-degree murder:   "Here, the 'verdict obtained' was purposeful or knowing murder.   Although the state court[] found that there was overwhelming evidence of petitioner's 'involvement in' or 'participation in' the crime, without Terrell's testimony . . , the jury could not have returned a verdict of purposeful murder."   (ECF No. 9 at 31.)

The Appellate Division did note the importance of Terrell's testimony to the State's case. See Bozeman, 2011 WL 2496218 at *6 ("[W]e do not minimize Terrell's testimony, as the State's supplemental letter . . . concedes that 'Terrell was a key State's witness at [Bozeman's] trial.'"). But, as Ali correctly contends, the Appellate Division's harmlessness analysis focused solely on the question of Ali's presence during the incident.   The appellate court did not consider the significance of Terrell's testimony for the first-degree murder verdict and did not even mention that Terrell's testimony was the only direct evidence that Ali was the shooter.   Mary could not identify which of the two men killed her husband.   The Appellate Division noted that DNA

27

evidence showed that the DNA of Ali and Nathan was on the sweatshirt found in the minivan, but the court did not consider or mention that this forensic evidence is consistent with Terrell's being the shooter:   Mary identified Terrell at trial and she testified that the other man (Ali) handcuffed Nathan while Terrell handcuffed her, and the medical examiner testified that the absence of stippling by the two gunshot wounds established that the shooter was 18 to 24 inches away from Nathan.   In light of these facts, is possible if not likely that Nathan's DNA was on the sweatshirt worn by Ali, even though Terrell shot Nathan.   Notably, the Appellate Division failed to consider the significance of the fact that the State did not test Terrell for gunshot residue, even though he was arrested as he ran from the getaway car.

In addition, the Appellate Division failed to discern that the excluded cross-examination related to the robbery.   Terrell testified during Ali's trial that the motive for the robbery was to repay a $25,000 debt that Ali owed to the very drug organization Terrell was negotiating to testify against in the federal prosecution.   Terrell testified on remand that the loss of this $25,000 was creating problems for him.   Because Terrell's testimony was crucial to the jury's finding that Ali was the one who purposely and knowingly killed Nathan and because the excluded testimony bore directly on the motive for the robbery, this first factor weighs heavily in Ali's favor.   See, e.g., Blackston v. Rapelje, 780 F.3d 340, 360 (6th Cir. 2015) (affirming granting of writ, Court of Appeals noted that the unconstitutionally excluded cross-examination was crucial where the witness was the only witness who testified he *actually saw* Blackston shoot Miller:   "the state's entire theory of the case was that *Blackston* had killed Miller, and the identity of the killer is thus a critical fact that cannot be dismissed as a minor detail."); Ortiz v. Yates, 704 F.3d 1026, 1039 (9th Cir. 2012) (finding in habeas case that Confrontation Clause error was not harmless, the Court

28

of Appeals noted that, "[a]s the victim and sole eyewitness to the assault, Miriam provided the only direct evidence linking Ortiz to her injuries."). However, by ignoring these crucial undisputed portions of the record and by considering the significance of Terrell's testimony solely in the context of whether or not Ali was present during the incident, the Appellate Division unreasonably applied the first Van Arsdall factor.

 (2) Whether the Prohibited Cross-Examination Testimony Was Cumulative

 The State argues that Ali's cross-examination of Terrell provided ample opportunity to impeach him. The Appellate Division "perceive[d] that the additional areas of inquiry sought by Bozeman [Ali] to explore with Terrell were cumulative, largely because any additional bias or interest that could have been thereby exposed was only marginally related to the State's prosecution . . . . These involvements did not give the State any sway over Terrell that might prompt [him] to color his testimony in favor of the prosecution." Bozeman, 2011 WL 2496218 at *8.

 The Appellate Division misperceived the nature of cumulative evidence in this context and, accordingly, unreasonably applied the second Van Arsdall factor. See Olden, 488 U.S. at 232 (holding that the Confrontation Clause error was not harmless even though defense counsel cross-examined witness regarding a number of inconsistencies in her various accounts of the crime); see also Davis, 415 U.S. at 314-320. As Ali explains, "the excluded testimony was not 'cumulative' because the jury heard absolutely nothing about Terrell's cooperation in a federal death penalty case; his expectation of immunity for those charges; or the promise that he would be recommended for admission into the Witness Security program" in order to serve his New Jersey sentence in federal custody. (ECF No. 9 at 25.) The Appellate Division did not discern or consider that the

unconstitutional limit placed on Terrell's cross-examination prevented counsel from exposing a separate and distinct motive for Terrell to testify that Ali was the shooter and to otherwise testify in favor of the prosecution:   to satisfy or please the federal prosecutor who had yet to finalize the federal non-prosecution agreement with him.   The Court finds Ali's argument on this point compelling:

> But the issue, of course, is whether petitioner was able to establish **why** Terrell would lie.   As noted, "the exposure of a witness' motivation in testifying is a proper and important function" of the right of confrontation.   Davis, 415 U.S. at 316-17.   In his testimony at the remand, Terrell agreed that he knew that he was "in a jam" and was "looking to take care of [him]self," so he started "working" for law enforcement agencies in several jurisdictions by giving them information and "making phone calls."   As the State acknowledges, Terrell's "greatest concern was security for himself and his family," which is "why he wanted to serve his sentence in a safe federal facility."   In order to place himself in a safe setting, preferably in the Witness Security Program, Terrell had to satisfy both federal and state officials. But none of that ever came out at petitioner's trial; the jury never heard about Terrell's "greatest concern," or how he had contacted various law enforcement agencies and started "working for" them in order to help himself.

(ECF No. 9 at 29) (emphasis in original) (citations to record omitted).

The Appellate Division failed to discern that Terrell's testimony against Ali was a trial run for his testimony against McGriff and the other members of the drug organization targeted by federal authorities.   Terrell testified at the remand hearing that he hoped that the federal prosecutor would not prosecute him for his federal crimes (that would expose him to a life sentence) and that she would submit a recommendation for Terrell to serve his New Jersey sentence in the witness protection program.   Again, by ignoring critical undisputed facts in the record and by failing to understand that the excluded cross-examination was not cumulative, the Appellate Division unreasonably applied the second Van Arsdall factor, which weighs heavily in Ali's favor.

(3) Existence of Evidence Corroborating or Contradicting Terrell's Testimony on Material Points

Most significantly, it bears repeating that the Appellate Division ignored the fact that there was no direct evidence other than Terrell's testimony to establish that Ali, rather than Terrell, was the one who killed Nathan Johnson.   The Appellate Division mentioned in explaining Ali's connection to the getaway minivan the presence of Ali's and Nathan Johnson's DNA on a sweatshirt found in the minivan, see Bozeman, 2011 WL 2496218 at *7, but as explained above, this evidence does not preclude Terrell being the shooter.   It also bears repeating that the Appellate Division ignored that, although Terrell was arrested shortly after the murder, the police did not test him for gun power residue and there was no forensic evidence establishing that the shooter was Ali.   Because the Appellate Division failed to consider that Terrell's testimony provided the only direct evidence that Ali killed Nathan Johnson, it also failed to discern that Terrell's credibility on this point was critical to the jury's finding Ali guilty beyond a reasonable doubt of first-degree murder.   The Appellate Division unreasonably applied the third Van Arsdall factor which unquestionably weighs in Ali's favor.

(4) Extent of Cross-Examination Otherwise Permitted

The Appellate Division reasonably found that the cross-examination of Terrell was not otherwise limited and that the fourth Van Arsdall factor weighs in favor of the State.

(5) Overall Strength of the Prosecution's Case

The formidable evidence of Ali's guilt the Appellate Division pointed to concerns Ali's presence during the robbery and murder of Nathan Johnson.   In finding that the unconstitutional limit on Terrell's cross-examination was harmless beyond a reasonable doubt, the Appellate

Division cited the following evidence (outside of Terrell's testimony) which connected Ali to the incident:  Ali's family connection to the burgundy minivan, the presence of Ali's and Nathan's DNA on a sweatshirt found in the minivan, the presence of Ali's car keys, his wallet and a beauty salon card inside the minivan, Ali's being seen in New York City several hours after the incident wearing blue shorts, and Ali's flight immediately following the incident after informing his girlfriend that there was some trouble.   The Appellate Division did not consider that all of the evidence it relied on to find the Confrontation Clause violation harmless is consistent with Terrell's being the shooter.   See Adamson v. Cathel, 633 F.3d 248, 260 (3d Cir. 2011) (holding in habeas case that Confrontation Clause error was not harmless where "most of the 'overwhelming' evidence the State points to concerns the robbery itself . . , all of which is true but does nothing to incriminate Adamson.").   Nor did the Appellate Division consider whether the foreclosed cross-examination of Terrell may have had an effect specifically on the jury's first-degree murder verdict, i.e., whether it was beyond a reasonable doubt that the prohibited cross-examination had no effect on the jury's first-degree murder verdict under Chapman.   See Bozeman, 2011 WL 2496218 at *7 ("Coupled with the vast assortment of other evidence linking Bozeman [Ali] with his co-defendants, and a convincing explanation for why the crime was committed - to obtain money to repay a (drug) debt - we harbor no reservations in determining, as did the remand court, that the contrived limitation placed on Terrell's cross-examination was harmless beyond a reasonable doubt.")

As explained above, no direct evidence other than the testimony of Terrell established that Ali, not Terrell, was the shooter.   By failing to consider the effect of the unconstitutionally excluded cross-examination on the jury's first-degree murder verdict, the Appellate Division

ignored another critical undisputed fact in the record:   the jury's note asking the trial judge to re-read the first-degree murder instruction.   This note demonstrated graphically that the State's case against Ali on the first-degree murder charge was far from overwhelming.   See Deck v. Jenkins, 768 F.3d 1015, 1029-30 (9th Cir. 2014) ("The jury's request for clarification, above all, leaves us with 'grave doubt' about whether the prosecutor's comments had a substantial and injurious effect or influence on the verdict."); Gongora v. Thaler, 710 F.3d 267, 282 (5th Cir. 2013) (finding in habeas case that error was not harmless, the Court of Appeals commented that notes sent out by the jury during deliberations hinted that the jury questioned the credibility of witness's testimony).

By ignoring critical facts in the record, the Appellate Division unreasonably applied the harmless beyond a reasonable doubt error test under Chapman, as well as the factors to be applied under Van Arsdall.   The Appellate Division failed to consider the likelihood that the jury might have reached a significantly different impression of Terrell's credibility when he testified that Ali was the killer had it been apprised of the magnitude of what Terrell hoped to gain by satisfying federal authorities.   See United States v. Chandler, 326 F.3d 210, 225 (3d Cir. 2003) (finding that prohibiting defendant from cross-examining two government witnesses about the magnitude of the sentence reduction they believed they would earn was not harmless:   "Because so much depended on the credibility of the cooperating witnesses, additional information about their motives in testifying might have proven decisive.")   As Ali argues,

> The jury was led to believe that shortly after his arrest, Terrell admitted his guilt, and that he received a relatively modest reward - 30 years in prison.   The truth - which the jury did not hear - was that almost from the day of his arrest, Terrell sought to deal his way out of a much greater predicament.   Faced with spending the rest of his life in prison, Terrell contacted law enforcement in Maryland; voluntarily testified before a federal grand jury; submitted to numerous interviews by the New York police and the FBI; and testified at the trials of two major drug

dealers.   His wheeling and dealing resulted in immunity from prosecution in the federal courts and admission into witness protection.   Certainly, if this testimony had been allowed, the jury would have "received a significantly different impression of [his] credibility."   Van Arsdall, 475 U.S. at 680.

(ECF No. 9 at 32-33.)

The Appellate Division unreasonably applied the fifth Van Arsdall factor, which when properly applied weighs heavily in Ali's favor.   As four of the five Van Arsdall factors weigh in Ali's favor, the Appellate Division's conclusion that the Confrontation Clause error in Terrell's cross-examination was harmless beyond a reasonable doubt constituted an unreasonable application of Van Arsdall, as well as Chapman.   There is much more than a reasonable possibility that, had the jury known that Tyrrell was seeking to obtain a deal from the U.S. Attorney with respect to his role in a drug organization, which deal would include no federal sentence for federal crimes punishable by life in prison and the recommendation that he serve his New Jersey sentence in the federal witness protection program, the jury would have "received a significantly different impression of [Terrell's] credibility," when he testified that Ali was the person who shot Nathan. Van Arsdall, 475 U.S. at 680; see also Ayala, 135 S.Ct. at 2203.   "When a federal judge in a habeas proceeding is in grave doubt about whether a trial error of federal law had 'substantial and injurious effect or influence in determining the jury's verdict,' that error is not harmless."   O'Neal, 513 U.S. at 436.   This Court has grave doubt about whether the unconstitutional limitation on the cross-examination of Terrell had a "substantial and injurious effect or influence in determining the jury's verdict" of first-degree murder.   Id.   The Appellate Division found otherwise, but for the reasons explained above, that determination was an objectively unreasonable application of Chapman and Van Arsdall under § 2254(d)(1).

34

## C.     Remedy

Having found that New Jersey deprived Ali of his Sixth Amendment right "to be confronted with the witnesses against him," U.S. Const. amend. VI, and that the constitutional violation had a "substantial and injurious effect or influence in determining the jury's verdict" on the first-degree murder charge, Brecht, 507 U.S. at 637, this Court must decide on the remedy. Section 2243 of Title 28 of the United States Code instructs the Court to "dispose of the matter as law and justice require."   28 U.S.C. § 2243.   When a federal district court reviews a state prisoner's habeas corpus petition pursuant to 28 U.S.C. § 2254, it must decide whether the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. 2254(a).   "The court does not review a judgment, but the lawfulness of the petitioner's custody simpliciter."   Coleman v. Thompson, 501 U.S. 722, 730 (1991).   As the Court of Appeals explained in Henderson v. Frank, 155 F.3d 159 (3d Cir. 1998), "[i]t would seem that federal habeas power is limited, first, to a determination of whether there has been an improper detention by virtue of the state court judgment; and second, if we find such an illegal detention, to ordering the immediate release of the prisoner, conditioned on the state's opportunity to correct constitutional errors that we conclude occurred in the initial proceedings."   Id. at 168.   "[F]ederal courts may delay the release of a successful habeas petitioner in order to provide the State an opportunity to correct the constitutional violation found by the court."   Hilton v. Braunskill, 481 U.S. 770, 775 (1987).

The proper remedy in this case is not to direct the New Jersey courts to revise the judgment of conviction and vacate the first-degree murder conviction, as this Court lacks the power to order a state court to amend a judgment of conviction, but to direct the State of New Jersey to release

Ali from "custody obtained through unconstitutional means, upon the state's failure to retry [him] within a reasonable time in a way that comports with constitutional dictates." Henderson, 155 F.3d at 168; see also Fay v. Noia, 372 U.S. 391, 430-31 (1963) ("Habeas lies to enforce the right of personal liberty; when that right is denied and a person confined, the federal court has the power to release him.   Indeed, it has no other power; it cannot revise the state court judgment; it can act only on the body of the petitioner.") (overruled in part on other grounds by Wainwright v. Sykes, 433 U.S. 72 (1977) and abrogated on other grounds by Coleman v. Thompson, 501 U.S. 722 (1991)); Henderson, 155 F.3d at 168 (noting that habeas court "lack[s] the ability to revise the state court judgment") (citation and internal quotation marks omitted); Smith v. Spina, 477 F.2d 1140, 1147 (3d Cir. 1973) ("The jurisprudential effect of the granting of a federal writ is to release relator from custody.   It does not have the force and effect of voiding a conviction.").   The Court will grant a Writ of Habeas Corpus and direct the Warden of New Jersey State Prison to release Malik-Imari Ali (also known as Darryl Bozeman) in 120 days unless he is retried within that period.   See Gibbs v. Frank, 500 F.3d 202, 207 (3d Cir. 2007) ("The District Court's selection of 120 days [to retry Gibbs] was eminently reasonable."); Slutzker v. Johnson, 393 F.3d 373, 390 (3d Cir. 2004) (120 days); Holloway v. Horn, 355 F.3d 707, 730 (3d Cir. 2004) (120 days).

## IV.   CONCLUSION

This Court holds that the limitation on the cross-examination of Terrence Terrell violated the Confrontation Clause, the New Jersey courts' unreasonably applied Van Arsdall and Chapman in deciding that the error was harmless beyond a reasonable doubt, and the error had a substantial and injurious effect or influence in determining the jury's first-degree murder verdict.   The Court

will grant a Writ of Habeas Corpus to Malik-Imari Ali (also known as Darryl Bozeman) and order

his release unless the State retries him within 120 days.


    s/Dickinson R. Debevoise
**DICKINSON R. DEBEVOISE**
**U.S.S.D.J.**

Dated:   July 8, 2015